IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

UNITED STATES OF AMERICA

vs.                                    Case Nos.:    3:07cr57/MCR
                                                     3:09cv349/MCR/EMT

DAVID ISAIAH ROGERS

---

## REPORT AND RECOMMENDATION

This matter is before the court upon Defendant's second amended motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 (doc. 348). The Government filed a response (doc. 353), and Defendant filed a reply (doc. 359). After review of the parties' submissions, the court directed the Government to file a supplemental response (*see* doc. 373), which it has done (doc. 374), and Defendant filed a supplemental reply (doc. 376). The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B). After a careful review of the record and the arguments presented, it is the opinion of the undersigned that Defendant has not raised any issue requiring an evidentiary hearing, Rules Governing Section 2255 Cases 8(a) and (b), and that his motion should be denied.

## I.  BACKGROUND

Defendant entered a guilty plea to a single-count indictment charging him with conspiracy to distribute and possess with intent to distribute one thousand kilograms or more of marijuana (*see* docs. 121, 186). The brief statement of facts contained in the written plea agreement explained that the amount of marijuana distributed by Defendant and co-conspirator John Mikhael exceeded one thousand kilograms (doc. 121 at 7). The offense conduct exposed Defendant to a mandatory minimum sentence of ten years imprisonment with a maximum possible penalty of life (*id.* at 1).

The agreement carried with it the obligation of cooperation, which of course contemplated that Defendant would provide truthful and complete information (*id.* at 4).   Finally, the agreement specifically provided that the office of the United States Attorney had the sole discretion to determine whether Defendant had provided substantial assistance in the investigation or prosecution of other persons, and that if its office filed a substantial assistance motion, both the granting of relief and the extent of relief would be solely at the discretion of the District Court (*id.* at 5).

The plea proceeding, at which Defendant and co-defendant Jennifer Lea Jones simultaneously entered guilty pleas, was conducted on May 23, 2007, and was relatively unremarkable.  Although Defendant stated he had read the plea agreement with his attorney, he took a few moments to review it again in court (*see* doc. 186 at 32–34).  After Defendant had done so, the court asked him if he had done what the Government said he had done, to which he responded in the affirmative (doc. 186 at 34).  The court then specifically asked, "[i]ncluding the last sentence of the factual basis which states the drug weight involved, do you understand that as well and agree to that?" (*id.*).[1]  Defendant again responded, "Yes, ma'am" (*id.*).  Defendant also indicated his satisfaction with counsel's representation of him (*id.* at 36), and he did not appear shy about interrupting the proceedings when he wished to ask a question or interject a comment (*see, e.g.,* doc. 186 at 33, 40, 41).  The court accepted Defendant's guilty plea (*id.* at 38).

A Presentence Investigation Report ("PSR") was prepared prior to sentencing.  The original PSR reflected that Defendant had a base offense level of 32 due to the quantity of marijuana involved in the conspiracy, that he received a three-level upward adjustment for his role in the offense and a three-level downward adjustment for acceptance of responsibility, and that his total offense level was 32 (PSR ¶¶ 74, 77, 80, 81).  He had a criminal history category of II (PSR ¶¶ 86–89), and therefore an applicable advisory guidelines range of 135 to 168 months imprisonment. Defendant objected to the quantity of drugs attributed to him,[2] to the role adjustment, and to the

---

[1] This sentence provided that during the course of the conspiracy "the amount of marijuana acquired and ultimately distributed by the defendant and John Mikhael in this manner exceeded one thousand kilograms" (doc. 121 at 7).

[2] Defendant's written objections, appended to the PSR, include the statement that "[n]othing set forth in these objections is intended to vary or contradict the terms or contents of the Plea and

criminal history computation, and he also contended he was eligible for safety valve consideration (PRS ¶¶ 135–145).  The Government objected to the probation officer's failure to include a two-level upward adjustment due to a co-conspirator's use of a firearm (PSR ¶¶ 150–152).  It also argued that Defendant should not receive the three-level acceptance of responsibility adjustment, claiming that Defendant had "falsely denied and/or frivolously contested both relevant conduct and that conduct comprising the offense" (PSR ¶ 153).  Although some modifications were made to the PSR, the majority of the objections were unresolved prior to sentencing.

At sentencing (*see* doc. 305), the Government presented the testimony of cooperating co-defendant John Peter Mikhael (also known as "J.P.") with respect to Defendant's involvement in recruiting drivers, his purchases of large quantities of marijuana, and his minimal involvement in purchasing and delivering cocaine (doc. 305 at 19–39).  Co-defendant Justin Mikhael also testified for the Government about Justin's sale of marijuana to Defendant, the fact that he never sold Defendant any cocaine, and Justin's possession of weapons (doc. 305 at 51–57).  Case agent Mike Bettis testified about the recovery of a bottle of Inositol powder (which is used for cutting cocaine), fifteen to sixteen duffel bags containing marijuana residue, and other items from Defendant's residence, as well as approximately nineteen visits Defendant made to Justin Mikhael's residence that were recorded on video (*id.* at 61–66).  On cross-examination, defense counsel elicited testimony that Defendant was the one who tipped off law enforcement to the fact that the Mikhael brothers were dealing in cocaine, and that Defendant had presented law enforcement with information about drug activity he had learned of while in jail (*id.* at 69–71).

Defendant called Jesse Ryan East to testify that it had been Mr. East who first approached Defendant about East becoming a courier (doc. 305 at 73–77), although Defendant was the one who first told John Mikhael about East's interest in doing so (*id.* at 81).  John David Sands, another courier, testified that Defendant did not recruit him or direct his activities, but that Sands just

---

Cooperation Agreement entered into by the Defendant and the United States." Although this objection does appear to contradict the terms of the plea agreement and Defendant's express admission at rearraignment with respect to drug weight, counsel explains in his affidavit in response to the § 2255 motion that the challenge was not intended to be to the drug weight involved in the entire conspiracy, but rather to the drug weight attributable to Mr. Rogers (doc. 353, att. 2 at ¶¶ 33, 35).

transported marijuana for the Mikhael brothers (*id.* at 83– 86).  Defendant himself took the stand, and it is his decision to testify along with the substance and results of this testimony that form the core of the instant motion (*id.*  at 87–114).

Defendant testified that he began dealing with John Peter Mikhael in late 2005 or early 2006 and that throughout the course of the conspiracy he paid J.P. about $40,000 for marijuana (doc. 305 at 89–90).  With respect to the recruitment and payment of couriers, Defendant denied having been involved in recruitment.  He said that he had not talked to J.P. about Jesse East working as a courier, but rather that East had approached J.P. on his own and had always been supervised by J.P. after beginning to function as a courier (*id.* at 90–91).  Defendant also testified that due to financial problems Dana Tigano approached him about becoming a courier rather than vice versa, and that he tried to discourage her because she had a young child (*id.* at 92–94).  He said that it was J.P. who initiated the idea of Defendant's girlfriend, Brittanee Krunk, doing some courier work, and J.P. approached her with the idea (*id.* at 94–96).  He also stated he was not involved in paying the drivers except when J.P. requested that he chip in (*id.* at 96), and he denied that he was trying to recruit couriers in order to get a better price on marijuana from J.P. (*id.* at 102).  Defendant also testified in some detail about the marijuana he had purchased.  He admitted that he purchased five to ten pounds of marijuana from Justin Mikhael eight or ten times, and that he received between ten and twenty pounds of marijuana from loads driven by Dana Tigano at least five times, ten or fifteen pounds from one load transported by Jesse East, fifteen to twenty pounds from one or two loads driven by Brittanee Krunk, and ten to twenty pounds from one load driven by Carrie Meyer (*id.* at 96–98).  Defendant admitted that he sold two, single-ounce quantities of cocaine that J.P. Mikhael fronted to him, but he denied having received any more cocaine from J.P. or from any other person (*id.* at 100–01).  On cross-examination, Defendant was unable to identify anyone to whom he distributed marijuana except by their first name or nickname (*id.* at 107–08).

Dana Tigano, now Fletcher, was the final witness for the defense (doc. 305 at 114).  Ms. Fletcher corroborated Defendant's testimony when she explained that she approached Defendant about becoming a courier, and Defendant subsequently set up a meeting between her and J.P. Mikhael at her request (*id.* at 115–16).  Fletcher further testified that the decision whether she was to become a courier was J.P. Mikhael's, that she drove to Texas eight or nine times,  and that she

was under J.P. Mikhael's direction and supervision, not Defendant's (*id.* at 116–18).   She acknowledged on cross-examination that it was Defendant who facilitated her introduction to J.P. Mikhael, and that although J.P. Mikhael typically paid her for her services, Defendant paid her one time and was aware of what she was doing during the time he lived with her (*id.* at 119–20, 121–22, 124–25).

   The court heard argument from the attorneys and afforded Defendant the opportunity to address the court before advising the parties that it needed to consider the testimony and pertinent case law before imposing sentence and concluding the proceedings.   Sentencing reconvened on October 17, 2007 (doc. 306).   The court held Defendant accountable for 1,067.7 kilograms of marijuana based on the testimony presented and the facts set forth in the PSR  (*id.* at 5–6), an amount that included both actual marijuana and the marijuana equivalency for a limited amount of cocaine.   The court sustained the defense objection to the role adjustment based on the testimony presented at the first sentencing hearing, but also sustained the Government's objection to the acceptance of responsibility adjustment, specifically finding that Defendant had falsely denied his involvement with the cocaine part of the conspiracy (*id.* at 6–7).   It overruled the defense objection to the criminal history calculation, thus finding that Defendant was ineligible for the safety valve (*id.* at 7–8).   The court made the additional finding that Defendant attempted to "obstruct or impede the administration of justice with respect to his sentencing by testifying falsely with regard to his relevant conduct with the cocaine" and assessed the two-level obstruction of justice adjustment (*id.* at 8).   Finally it noted the stipulation as to the application of the firearm adjustment, although the court noted that even in the absence of the stipulation it would have made the same finding (*id.* at 8–9).   After resolution of the disputed matters, Defendant's total offense level was recalculated at 36, his criminal history category remained at two, and the applicable advisory guideline range was 210 to 262 months (*id.* at 9).   The court sentenced Defendant to a term of 236 months imprisonment, at the mid-point of his guideline range (*id.* at 10).   After being advised of his appellate rights, Defendant requested that a notice of appeal be entered immediately (*id.* at 13; doc. 247).

   On appeal, Defendant raised four grounds for relief (doc. 327 at 3).   First, he contested the amount of drugs attributed to him, contending that the cocaine should have been excluded from the total quantity since it was he who alerted law enforcement to the fact that the conspiracy also

involved cocaine.  Second, he maintained that the court erred by finding that he committed the offense conduct while on probation.  Third, he contested the application of the obstruction of justice adjustment and denial of reductions for acceptance or responsibility and safety-valve relief.  Finally, he argued his sentence was "unreasonable."  The sentence was affirmed on appeal (doc. 327 at 3, 15).

In the present motion, defendant raises four grounds for relief, each related to the performance or experience of defense counsel, although separate allegations are contained in his supporting memorandum.  The government opposes the motion in its entirety.

## II.  LEGAL ANALYSIS

A.  General Standard of Review

Because collateral review is not a substitute for direct appeal, the grounds for collateral attack on final judgments pursuant to § 2255 are extremely limited.  A prisoner is entitled to relief under section 2255 if the court imposed a sentence that (1) violated the Constitution or laws of the United States, (2) exceeded its jurisdiction, (3) exceeded the maximum authorized by law, or (4) is otherwise subject to collateral attack.  28 U.S.C. § 2255; Thomas v. Crosby, 371 F.3d 782, 811 (11th Cir. 2004); United States v. Phillips, 225 F.3d 1198, 1199 (11th Cir. 2000).  "Relief under 28 U.S.C. § 2255 'is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice.'"  Lynn v. United States, 365 F.3d 1225, 1232 (11th Cir. 2004) (citations omitted).  The "fundamental miscarriage of justice" exception recognized in Murray v. Carrier, 477 U.S. 478, 496 (1986), provides that it must be shown that the alleged constitutional violation "has probably resulted in the conviction of one who is actually innocent . . . ."

The law is well established that a district court need not reconsider issues raised in a section 2255 motion which have been resolved on direct appeal.  United States v. Nyhuis, 211 F.3d 1340, 1343 (11th Cir. 2000); Mills v. United States, 36 F.3d 1052, 1056 (11th Cir. 1994); United States v. Rowan, 663 F.2d 1034, 1035 (11th Cir. 1981); Hidalgo v. United States, 138 Fed. Appx. 290 (11th Cir. 2005).  Once a matter has been decided adversely to a defendant on direct appeal, it cannot be re-litigated in a collateral attack under section 2255.  Nyhuis, 211 F.3d at 1343 (quotation omitted).  Broad discretion is afforded to a court's determination of whether a particular claim has

been previously raised.  Sanders v. United States, 373 U.S. 1, 16 (1963) ("identical grounds may often be proved by different factual allegations . . . or supported by different legal arguments . . . or couched in different language . . . or vary in immaterial respects").

Furthermore, a motion to vacate under section 2255 is not a substitute for direct appeal, and issues which could have been raised on direct appeal are generally not actionable in a section 2255 motion and will be considered procedurally barred.  Lynn, 365 F.3d at 1234–35; Bousley v. United States, 523 U.S. 614, 621 (1998); Mills v. United States, 36 F.3d at 1055 (recognizing that a ground is "available" on direct appeal when "its merits can be reviewed without further factual development"); United States v. Frady, 456 U.S. 152, 165 (1982).  Absent a showing that the ground of error was unavailable on direct appeal, a court may not consider the ground in a section 2255 motion unless the defendant establishes (1) cause for not raising the ground on direct appeal, and (2) actual prejudice resulting from the alleged error, that is, alternatively, that he is "actually innocent."  Lynn, 365 F.3d at 1234; Bousley, 523 U.S. at 622 (citations omitted).  To show cause for procedural default, a defendant must show that "some objective factor external to the defense prevented [him] or his counsel from raising his claims on direct appeal and that this factor cannot be fairly attributable to [defendant's] own conduct."  Lynn, 365 F.3d at 1235.  A meritorious claim of ineffective assistance of counsel can constitute cause.  See Nyhuis, 211 F.3d at 1344.

Ineffective assistance of counsel claims are generally not cognizable on direct appeal and are properly raised by a § 2255 motion regardless of whether they could have been brought on direct appeal.  Massaro v. United States, 538 U.S. 500, 503 (2003); see also United States v. Patterson, 595 F.3d, 1324, 1328 (11th Cir. 2010).  The benchmark for judging a claim of ineffective assistance of counsel is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  Strickland v. Washington, 466 U.S. 668, 686 (1984).  To show a violation of his constitutional right to counsel, a defendant must demonstrate both that counsel's performance was below an objective and reasonable professional norm and that he was prejudiced by this inadequacy.  Id., 466 U.S. at 686; Williams v. Taylor, 529 U.S. 362, 390 (2000); Gaskin v. Secretary, Dept. of Corrections, 494 F.3d 997, 1002 (11th Cir. 2007).  "Strickland's two-part test also applies where a prisoner contends ineffective assistance led him or her to enter an improvident guilty plea."  Yordan v. Dugger, 909

F.2d 474, 477 (11th Cir. 1990) (*citing* Hill v. Lockhart, 474 U.S. 52 (1985)); United States v. Pease, 240 F.3d 938, 941 (11th Cir. 2001).  In applying Strickland, the court may dispose of an ineffective assistance claim if defendant fails to carry his burden on either of the two prongs.  466 U.S. at 697.

In determining whether counsel's conduct was deficient, this court must, with much deference, consider "whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688; *see also* Dingle v. Secretary for Dept. of Corrections, 480 F.3d 1092, 1099 (11th Cir. 2007).  "[R]eviewing courts must indulge a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance."  Yordan, 909 F.2d at 477 (citing Harich v. Dugger, 844 F.2d 1464, 1469 (11th Cir. 1988); Dingle, 480 F.3d at 1099; Chandler v. United States, 218 F.3d 1305, 1314 (11th Cir. 2000); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation")). Counsel's performance must be evaluated with a high degree of deference and without the distorting effects of hindsight.  Strickland, 466 U.S. at 689. To show counsel's performance was unreasonable, a defendant must establish that "no competent counsel would have taken the action that his counsel did take."  Gordon v. United States, 518 F.3d 1291, 1301 (11th Cir. 2008) (citations omitted); Chandler, 218 F.3d at 1315 (en banc)).  When examining the performance of an experienced trial counsel, the presumption that counsel's conduct was reasonable is even stronger, because "[e]xperience is due some respect."  Chandler, 218 F.3d at 1316 n.18.

With regard to the prejudice requirement, a defendant must establish that, but for counsel's deficient performance, the outcome of the proceeding would have been different.  Strickland, 466 U.S. at 694.  For the court to focus merely on "outcome determination," however, is insufficient; "[t]o set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him." Lockhart v. Fretwell, 506 U.S. 364, 369–70 (1993).  A defendant therefore must establish "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  Lockhart, 506 U.S. at 369 (quoting Strickland, 466 U.S. at 687).  Or in the case of alleged sentencing errors, a defendant must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been less harsh due to a reduction in the defendant's offense level.  Glover v. United States, 531 U.S. 198, 203–04 (2001).  A significant

increase in sentence is not required to establish prejudice, as "any amount of actual jail time has Sixth Amendment significance." *Id.*

To establish ineffective assistance, defendant must provide factual support for his contentions regarding counsel's performance. Smith v. White, 815 F.2d 1401, 1406–07 (11th Cir. 1987). Bare, conclusory allegations of ineffective assistance are insufficient to satisfy the Strickland test. Wilson v. United States, 962 F.2d 996, 998 (11th Cir. 1992); Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991); Stano v. Dugger, 901 F.2d 898, 899 (11th Cir. 1990) (citing Blackledge v. Allison, 431 U.S. 63, 74 (1977)); United States v. Ross, 147 Fed. Appx. 936, 939 (11th Cir. 2005).

Finally, the Eleventh Circuit has recognized that given the principles and presumptions set forth above, "the cases in which habeas petitioners can properly prevail . . . are few and far between." Chandler, 218 F.3d at 1313. This is because the test is not what the best lawyers would have done or even what most good lawyers would have done, but rather whether some reasonable lawyer could have acted in the circumstances as defense counsel acted. Dingle, 480 F.3d at 1099; Williamson v. Moore, 221 F.3d 1177, 1180 (11th Cir. 2000). "Even if counsel's decision appears to have been unwise in retrospect, the decision will be held to have been ineffective assistance only if it was 'so patently unreasonable that no competent attorney would have chosen it.'" Dingle, 480 F.3d at 1099 (quoting Adams v. Wainwright, 709 F.2d 1443, 1445 (11th Cir. 1983)). The Sixth Circuit has framed the question as not whether counsel was inadequate, but rather counsel's performance was so manifestly ineffective that "defeat was snatched from the hands of probable victory." United States v. Morrow, 977 F.2d 222, 229 (6th Cir. 1992).

Although section 2255 mandates that the court conduct an evidentiary hearing "unless the motion and files and records conclusively show that the prisoner is entitled to no relief," a defendant must support his allegations with at least a proffer of some credible supporting evidence. *See* Chandler v. McDonough, 471 F.3d 1360, 1363 (11th Cir. 2006) (citing Drew v. Dept. of Corrections, 297 F.3d 1278, 1293 (11th Cir. 2002) (referring to "our clear precedent establishing that such allegations are not enough to warrant an evidentiary hearing in the absence of any specific factual proffer or evidentiary support"); Hill v. Moore, 175 F.3d 915, 922 (11th Cir. 1999) ("To be entitled to an evidentiary hearing on this matter [an ineffective assistance of counsel claim], petitioner must proffer evidence that, if true, would entitle him to relief.")); Ferguson v. United

States, 699 F.2d 1071, 1072 (11th Cir. 1983).  A hearing is not required on frivolous claims, conclusory allegations unsupported by specifics, or contentions that are wholly unsupported by the record.  Peoples v. Campbell, 377 F.3d 1208, 1237 (11th Cir. 2004); Tejada, 941 F.2d at 1559; Holmes v. United States, 876 F.2d 1545, 1553 (11th Cir. 1989) (citations omitted).  Likewise, affidavits that amount to nothing more than conclusory allegations do not warrant a hearing.  Lynn, 365 F.3d at 1239.

B.  Defendant's individual claims for relief

Defendant's first three claims for relief as presented in his motion, memorandum and reply all relate to counsel's advice or actions with respect to Defendant's testimony at sentencing.  He contends that counsel was ineffective because he did not advise Defendant of the potential adverse consequences of testifying after his guilty plea about the drug weight or gun enhancement, with such consequences including a perjury charge, a two-point adjustment for obstruction of justice, loss of his three-point acceptance of responsibility adjustment, and destruction of his credibility with the Government.  Defendant also claims that he was "coerced" into testifying, and he asserts that counsel did not protect his "right" to be credited for having provided information about other drug activity to the Government.  In his fourth ground for relief, Defendant contends that counsel lied to him by telling him that counsel had experience in federal court, when in fact this was counsel's first federal case.  Defendant asks for a chance to re-enter his guilty plea without having to make any argument at sentencing.

1.  Coercion

Defendant's claim that he was "coerced" into testifying at sentencing, as contrasted with his claim that he was "misadvised" with respect to testifying, is procedurally barred, as it was available to him on direct appeal.  See  Lynn, 365 F.3d at 1234–35; Bousley, 523 U.S. at 621 (1998); Mills v. United States, 36 F.3d at 1055 (recognizing that a ground is "available" on direct appeal when "its merits can be reviewed without further factual development"); United States v. Frady,  456 U.S. at 165.  As noted above, the court may not consider a procedurally defaulted claim absent a showing of cause and prejudice.  Lynn, 365 F.3d at 1234; Bousley, 523 U.S. at 622 (citations omitted).  Although a meritorious claim of ineffective assistance of counsel can constitute cause, see Nyhuis, 211 F.3d at 1344, Defendant has not provided any factual basis for his suggestion that he was

"coerced" to testify against his will, rather than misadvised, a contention that will be discussed below.  Furthermore, the record belies Defendant's claim of coercion, as his counsel stated at the outset of the sentencing proceedings that the defense intended to call two witnesses "and the defendant <u>if he chooses to testify</u>" (doc. 305 at 4–5) (emphasis added).  Additionally, just prior to Defendant's testimony, his counsel announced, "We'd call David Rogers" (*id.* at 86).  This announcement suggests that Defendant and his counsel jointly decided that Defendant would testify, especially considering that Defendant stated no objection to testifying, and the record demonstrates that it is unlikely that this particular Defendant would have hesitated to alert the court if he felt that counsel was forcing him to do something against his will (*see supra*, referring tod doc. 186 at 33, 40, 41).  Therefore Defendant has not established that he is entitled to relief on this portion of his claim.

2.  <u>Substantial assistance</u>

Defendant contends that he provided counsel with a copy of the detailed information he provided to case agents that was used to build a case and secure convictions of unidentified individuals.  He claims that counsel lost this information, and thus failed to protect Defendant's "right to be credited" for having provided this information.

Defendant's assertion that he had a "right" to receive credit for his assistance to the Government is misguided.  At the rearraignment, the district court made it abundantly clear to the Defendant that the decision as to whether to file a substantial assistance motion rested solely with the Assistant United States Attorney and his office, that neither the court nor his attorney had a role in that decision, and that Defendant had no recourse if he thought a substantial assistance motion was warranted but none was filed (doc. 186 at 29–30).  Defendant indicated that he understood (*id.* at 30).

The contents of the plea agreement and the court's explanation to Defendant are in accordance with governing law.  The decision to file a 5K1 motion is a matter of prosecutorial discretion.  <u>United States v. Nealy</u>, 232 F.3d 825, 831 (11th Cir. 2000), *cert. denied,* 122 S. Ct. 552, 151 L. Ed. 2d 428 (2001); <u>United States v. Orozco</u>, 160 F.3d 1309, 1315 (11th Cir. 1998); <u>United States v. Forney</u>, 9 F.3d 1492, 1501 (11th Cir. 1993).  The government has a power, not a duty, to file such a motion when a defendant has substantially assisted.  <u>Wade v. United States</u>, 504 U.S. 181,

185 (1992); (analyzing substantial assistance motions under § 5K1.1 and 18 U.S.C. § 3553(e)); *see also* United States v. McNeese, 547 F.3d 1307, 1309 (11th Cir. 2008) (applying Wade to Rule 35(b) motions).  Even plea agreements that require the government to consider whether the aid to the prosecution constitutes substantial assistance do not create a contractual duty to file a 5K1 motion. Forney, 9 F.3d at 1499–1500.  Judicial review of a decision not to file a 5K1 motion is appropriate only where there is an allegation and substantial showing that the prosecution refused to file a substantial assistance motion because of a constitutionally impermissible motivation, such as race or religion.  Wade, 504 U.S. at 185–86; United States v. Dorsey, 554 F.3d 958, 961 (11th Cir. 2009); Nealy, 232 F.3d at 831.  A defendant who merely claims to have provided substantial assistance or who makes only generalized allegations of an improper motive is not entitled to a remedy or even to an evidentiary hearing.  Wade, 504 U.S. at 186.

Filing of a certification of substantial assistance generally signifies that a defendant's assistance has yielded actual, useful results, not merely that the defendant made a substantial good faith effort in his or her attempts to assist.  *See* United States v. Gonsalves, 121 F.3d 1416, 1419 (11th Cir. 1997) (citation omitted).  "The substantial assistance regime is not a spoils system designed simply to reward a cooperative defendant; it is designed to benefit the government in its prosecution efforts."  Orozco, 160 F.3d at 1315.  A defendant's disappointment that his or her cooperation did not rise to the level of substantial assistance does not alone warrant a finding that the motion should have been filed.

Furthermore, Defendant's recollection of the facts does not comport with that of counsel's. In his affidavit, Attorney Lester states that on June 19, 2007, Defendant showed him written information concerning drug activity that he (Defendant) wished to provide to Agent Bettis of the DEA (doc. 353, att. 2 at ¶ 10).  Attorney Lester states he received permission from Defendant to make a copy of the written information for his file (*id.*).  Lester states that on the following day, June 20, 2007, Defendant was debriefed by Bettis and that during the debriefing Defendant gave Bettis the written information, and Bettis reviewed it with Defendant (*id.*, ¶¶ 11, 31).  Counsel states that

Defendant provided no other written information to him, and that he did lose or misplace any items provided to him by Defendant (*see id.*, ¶ 31).[3]

The Government clearly did not find that the information provided by Defendant was credible.  When counsel spoke to Bettis approximately one month later, Bettis told counsel that Bettis had been instructed not to talk to Defendant again until after sentencing because Defendant's version of events was widely different from the information law enforcement had received from a number of other sources (*id.* at ¶¶ 16, 31).  Thus, Defendant had already lost credibility with the Government before his testimony at sentencing.  Counsel states that he contacted the Government again on his client's behalf after sentencing, noting Defendant's willingness to cooperate, but the Government advised that it had no interest in Defendant's cooperation due to his "false testimony at sentencing and frivolous objections to relevant conduct in the PSR" (*id.* at ¶ 31).  The Government also told counsel that its case against an individual about whom Defendant had provided information was not based on the information provided by Defendant (*id.*).  Because Defendant did not have a "right" to receive credit for his attempts to cooperate with the Government, he is not entitled to relief on this basis.

### 3.  Failure to advise Defendant on his decision to testify[4]

Defendant claims that counsel did not properly advise him on the risks of testifying about the gun[5] and drug weight before he took the stand at sentencing, so Defendant could make an informed decision about whether to do so.

As noted above, the court declined to credit Defendant with the three-level downward adjustment for acceptance of responsibility and added a two-level upward adjustment for obstruction of justice, not *because* Defendant testified, but because the court found his testimony at sentencing

---

[3] Even if Defendant's assertion that counsel "lost" some of the information Defendant provided was correct, there is no reason that Defendant could not have verbally shared the information with the agents, including Agent Bettis, who interviewed Defendant just one day after Defendant discussed the written information with counsel and permitted counsel to copy it.

[4] This is the claim that the Government was directed to address in its supplemental response.

[5] Although Defendant raises the gun adjustment as a separate ground for relief in his § 2255, he actually did not testify about this issue, as the parties stipulated to the propriety of its application.

to be untruthful (doc. 306 at 6– 7, 8).  Although Defendant does not explicitly admit that he lied to the court, he skirts the issue by claiming that he "never intended to disrespect the Sentencing Court by testifying falsely" (doc. 359 at 6).

There are two premises in his reply memorandum that figure prominently in Defendant's argument but which are not entirely accurate.  First, Defendant states that his testimony was not "necessary," although it actually was the only testimony that supported at least two of his sentencing arguments.  Additionally, Defendant repeatedly asserts that the cocaine weight did not affect his guidelines range (*see, e.g.,* doc. 359 at 6, 8, 12, 13, 20).  This is false.  Defendant's offense conduct involved only 911 kilograms of actual marijuana (doc. 306 at 3).   However, because he was also held accountable for 783.5 grams of cocaine, which converts to 156.7 kilograms of marijuana (*id.* at 4, 5), he was held accountable for a total of 1067.7 kilograms of marijuana (*id.* at 5).  Therefore, the cocaine weight was not only relevant, but critical, as its inclusion increased Defendant's base offense level from 30 to 32 (*see* U.S.S.G. § 2D1.1(c)(4) and (5)).  Defendant's testimony, although ultimately found to be untruthful, was the only evidence available to rebut the Government witnesses' testimony about his involvement with cocaine.  Similarly, Defendant's testimony about when he joined the conspiracy was key to the applicability of the safety valve, U.S.S.G. § 5C1.2.  There was no other evidence supporting Defendant's position that he had not joined the conspiracy until he was off probation.  If his testimony had been credited by the court, he would have had only a single criminal history point and thus would have been eligible for safety-valve consideration (*see* doc. 353, att. 2 at ¶ 32).  Finally, Defendant's testimony about his role in the offense, while perhaps not "necessary," corroborated the testimony of other witnesses and led to the trial court sustaining his objection to the PSR's assessment of points for his role in the offense (*see* doc. 374, att. 1 at 4).

Defendant claims that because counsel allowed him to testify, his credibility with the Government was destroyed.  Counsel reiterates three times in  his affidavit that his client's decision to testify at sentencing was "his own choice," and he further states that counsel "could not have prevented him from exercising that right" (doc. 353, att. 2 at ¶ 28, 29, 34).  This is true.  Even more pertinent to the matter at hand, as the court has already noted, according to the unrebutted statement in counsel's affidavit, Defendant's credibility was already in jeopardy. On June 20, 2007, Defendant met with Agent Bettis in an attempt to cooperate, but Bettis informed counsel that Defendant's

version of events was widely different from the information law enforcement had received from a number of different sources and the Government was not interested in his cooperation, a fact of which Defendant was aware well before sentencing (doc. 353, att. 2 at ¶¶ 11, 16).  Thus, it was not the fact of his testimony but the Defendant's lack of truthfulness and attempt to minimize his involvement in the conspiracy that was detrimental (*id.* at ¶ 16), and in fact was arguably a violation of his plea and cooperation agreement.

Under Strickland, counsel's function is to assist the defendant, which involves a duty to "consult with the defendant on important decisions."  Strickland, 466 U.S. at 688; Florida v. Nixon, 543 U.S. 175 (2004).  One of these decisions is whether to testify in his own behalf.  Although counsel cannot compel Defendant to testify or to remain silent, it is it counsel who "bears the primary responsibility for advising the defendant of his right to testify or not to testify" and of "the strategic implications of each choice."  United States v. Teague, 953 F.2d 1525, 1532–33 (11th Cir. 1992); Corley v. United States, 406 Fed.  Appx. 342 (11th Cir. 2010).  Notwithstanding the existence of a fundamental right to testify, there is no concomitant right to commit perjury.  *See* United States v. Dunnigan, 507 U.S. 87, 96 (1993); Teague, 953 F.2d at 1532.  Because this fact would seem to be self-evident and thus need no citation, there is not a vast body of case law involving similar circumstances (i.e., a defendant accusing his lawyer of constitutional ineffectiveness because counsel failed to warn the defendant about specific adverse consequences that could occur if the defendant testified and was found to have committed perjury).  Two unreported and non-binding cases from within the Eleventh Circuit, however, are instructive.  In Smith v. United States, Nos. 8:09-cv-70-T-27MAP, 8:07-er-25-T-27MAP, 2010 WL 3363037 (M.D. Fla. Aug. 24, 2010), the defendant raised a claim virtually identical to that raised in the case at bar.  The Smith court stated:

> It is disingenuous for Petitioner to maintain that he did not understand that there were consequences for lying on the stand.  An attorney cannot be ineffective in failing to explain the obvious, that false testimony while under oath, subjects a defendant to a potential prosecution for perjury and a more severe sentence if convicted.

Smith, 2010 WL 3363037, at *2.  In Smith, though, the court also found, after a hearing, that defense counsel did explain the potential consequences of testifying and warned his client of the very consequence he ultimately received for lying, an enhanced sentence for obstruction of justice.

*Id.*  In <u>Corley v. United States</u>, 406 Fed. Appx. 342, 343 (11th Cir. 2010) the Eleventh Circuit affirmed the district court's denial of § 2255 relief after an evidentiary hearing, finding that defendant did not establish by a preponderance of the evidence that counsel failed to advise of the possibility of an obstruction of justice enhancement if defendant was found to have testified falsely at his sentencing hearing.  *Id.*  Although the attorney in <u>Corley</u> had no specific recollection of his conversation with defendant, he testified that his standard practice was to advise his clients that they would be subject to the adjustment if their testimony was not believed.  *Id.*; *compare* <u>United States v. Pungitore</u>, 965 F. Supp. 666, 673 (E.D. Pa. 1997) (counsel and defendant discussed at length the risks involved with cross-examination before defendant made the decision not to testify at trial).

The record suggests that this case was further complicated by Defendant's failure to provide truthful information even to his retained counsel (doc. 374, exh. 1 at ¶¶ 10, 12).  Counsel notes that his client did not admit to having any involvement with cocaine until August 14, 2007, which was after he had entered his guilty plea and not long before sentencing (*id.* at ¶ 12), necessitating revisions in counsel's objections to the PSR.  When counsel met with Defendant at the Santa Rosa County Jail on August 15, 2007, he discussed with him "how objections to the PSI would be resolved," including that the judge would resolve all disputed issues (which now included Defendant's involvement with cocaine) at sentencing, and that there would be negative consequences if the judge did not agree with Defendant's version of events (*id.* at ¶ 11).  Counsel specifically advised Defendant that he could lose his sentencing guidelines reduction for acceptance of responsibility (*id.*).

In addition to communicating directly with Defendant, it was also not unusual for counsel to communicate through his client's mother, Joyce Rogers (doc. 352, att 2 at ¶ 15).  For instance, on August 14, 2007, counsel sent an email to Ms. Rogers responding to Defendant's desire for a delay in his sentencing, in which counsel also indicated that the Court would determine any unresolved objections at sentencing, and that Defendant "could lose his two-level guidelines

reduction for acceptance of responsibility if the Court did not accept his version of events" (*id.* at ¶ 20; doc. 374, att. 1, exh. C).[6]  On that same date, counsel sent Defendant a letter in which he stated:

> Disputed matters will have to be resolved by the judge at sentencing.  Please be aware, however, that if the judge finds that you are not accepting responsibility for your actions, you could lose the two [sic] guideline points previously awarded for acceptance of responsibility.

(*Id.*, letter attached to att. 2).  Defendant's mother responded by inquiring, "What does or what is a 'two level reduction for acceptance of responsibility.'?  And what will be the result if he loses this reduction?" (Doc. 374, att. 1, exh. C).  Counsel responded that he had "addressed this point with [Defendant] when [he] went to see him in the jail" and explained that although Defendant's guidelines, as originally calculated, included a three-level reduction for acceptance of responsibility, he could lose that reduction and thus face a higher advisory guideline range if the judge did not believe he had accepted responsibility (*id.*).  Thus, by repeatedly advising Defendant he could lose the acceptance of responsibility reduction if the judge did not agree with or "accept" his version of the events, counsel placed Defendant (and his mother) on notice of a potential drawback to testifying.      One area of concern for the court was counsel's statement in his initial affidavit that his client "chose to take the stand and testify" (doc. 353, att. 2 at ¶ 25), without offering any explanation of how Defendant reached this decision.  In his supplemental affidavit, counsel explains that Defendant did not actually make the decision whether to testify until he was at the September 26, 2007 sentencing hearing (doc. 374, att. 1, ¶ 13).  Counsel states:

> To the best of my memory, he asked me in the courtroom before the hearing for my opinion as to whether he should testify.  I told him that the decision was his, but that if he did testify, he had to tell the truth.  Just before he actually took the stand, Mr. Rogers again asked me if he should testify.  I told him again that it was his decision. I never coerced or forced Mr. Rogers to testify.  It was Mr. Rogers' right to testify and I did not think it was appropriate to try to prevent him from exercising that right if he wished to.  I hoped that my advice to him to be truthful in his testimony, which was consistent with my advice to him throughout the case, would influence him to testify truthfully.

---

[6] Actually, the PSR afforded Defendant both the two-level adjustment for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a), as well as the additional one-level reduction pursuant to U.S.S.G. § 3E1.1(b).  (PSR ¶ 80).

(Doc. 374, att. 1, ¶¶ 13, 14).  Counsel concedes that he "did not specifically advise Mr. Rogers prior to his testimony that he could receive an upward adjustment to his guideline if the Court found that he had testified falsely and attempted to obstruct or impede justice" (*id.* at ¶ 16).  But, he also notes that had Defendant followed his advice to testify truthfully, he would not have received the obstruction adjustment; it was his client's "disregard" of this advice that resulted in the negative consequences (*id.* at ¶¶ 16, 16).[7]  Apparently, as counsel concludes, the possibility of losing the reduction for acceptance of responsibility was insufficient to influence Defendant to be truthful (*id.* at 16).

        In addition to counsel's advice, Defendant was aware of his responsibility to be truthful, as set out in the Plea and Cooperation Agreement (doc. 353, att. 2 at ¶ 28).  The Plea and Cooperation Agreement specifically provided that the agreement could be revoked if Defendant refused to cooperate, if his statement or testimony was untruthful or incomplete, or if he had failed to comply with any terms of the agreement (doc. 121 at 3).  Additionally, Defendant was warned at the time the clerk placed him under oath at rearraignment that if he failed to answer questions truthfully, he could be subject to a separate charge for perjury (doc. 186 at 4).  He was placed under oath a second time at the sentencing proceeding (doc. 305 at 87).  Therefore, he was on notice of an even more serious  adverse consequence—a separate charge of perjury—if he provided untruthful testimony, which the court found that he did.

        Even if every potential guidelines ramification of a decision to testify was not discussed prior to Defendant's decision to testify at sentencing, he was clearly on notice that there would be adverse consequences for testifying falsely.  Still, he chose to do so.  Counsel's failure to specifically mention the possibility of an obstruction adjustment under these circumstances does not rise to the level of ineffective assistance of counsel.  As noted above, the <u>Strickland</u> test contemplates not what the best lawyers would have done or even what most good lawyers would have done, but rather whether some reasonable lawyer could have acted in the circumstances as defense counsel acted.  <u>Dingle</u>, 480 F.3d at 1099; <u>Williamson</u>, 221 F.3d at 1180.  Counsel advised Defendant to be truthful, and Defendant knew there were potentially serious consequences if he chose to lie on the stand.

---

[7] There are two paragraphs numbered "16" in counsel's affidavit.

Furthermore, it is disingenuous for Defendant to suggest that, having been placed on notice about the possible loss of an acceptance of responsibility reduction, or even a separate charge for perjury if he testified falsely, that he would have heeded counsel's advice to be truthful if only counsel had specifically advised him about the potential obstruction adjustment as well.

        4.   Counsel's lack of experience

Defendant's final ground for relief is that counsel lied to him by claiming that he had federal court experience, when in fact this was counsel's first federal case (doc. 348 at 4).  Defendant has not shown how the fact of this alleged misrepresentation, even if true, affected the outcome of the proceedings.[8]  And, as discussed above, counsel's performance was not constitutionally ineffective.

### Certificate of Appealability

As amended effective December 1, 2009, § 2255 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  § 2255 11(b).

After review of the record, the court finds no substantial showing of the denial of a constitutional right.  § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, it is also recommended that the court deny a certificate of appealability in its final order.

The second sentence of  new Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  If there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Based on the foregoing, it is respectfully **RECOMMENDED**:

1.   The second amended motion to vacate, set aside, or correct sentence (doc. 348)  be **DENIED**.

---

[8] It should be noted that in his affidavit counsel refutes Defendant's claim that he lied to him (doc. 353, att. 2 at ¶ 30).

2.  A certificate of appealability be **DENIED**.

At Pensacola, Florida, this 8<u>th</u> day of May 2012.

<u>/s/ Elizabeth M. Timothy</u>
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

        **Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  Failure to object may limit the scope of appellate review of factual findings.** *See* **28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**